**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Calvin R. Bowler and Amy K. Bowler, husband and wife<br><br>Plaintiffs,<br><br>v.<br><br>Wells Fargo Bank, N.A.,<br><br>Defendant. | No. CV-19-05320-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 48). For the reasons stated below, the motion shall be granted in part and denied in part.

**I.   BACKGROUND**

   **A.   Factual Allegations**

The following allegations from Plaintiffs Calvin R. Bowler ("Calvin") and Amy K. Bowler's ("Amy," and together with Calvin, the "Bowlers") Second Amended Complaint (Doc. 45) are presumed true at this stage. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247 (9th Cir. 2013) ("[O]n a motion to dismiss, the court presumes that the facts alleged by the plaintiff are true.").[1]

---

[1] Unless otherwise indicated, in citing cases, all internal alterations, emphases, footnotes, quotation marks, and citations are omitted.

For almost 20 years, the Bowlers were the owners of a house located at 2925 South Palm Street in Gilbert, Arizona (the "Property"). (Doc. 45 at ¶ 1;[2] Doc. 45-1 at 1-2.) On July 7, 2006, they executed a SmartFit Home Equity Account® Agreement and Disclosure Statement with Wells Fargo, the beneficiary of a deed of trust against the Property to secure the account. (Doc. 45 at ¶ 2; Doc. 45-2 at 19-22.) The agreement had a credit line limit of $121,688.00, (Doc. 45-2 at 1), and the Bowlers borrowed $98,198.96. (Doc. 45 at ¶ 3.) In 2009, Wells Fargo restricted the Bowlers' ability to use the credit line to obtain additional extensions of credit. (Doc. 45-4.) Thereafter, in January 2010, the Bowlers and Wells Fargo executed a modified agreement in which the Bowlers consented to the permanent termination of their ability to draw additional amounts on the credit line. (Doc. 45-6 at 1, 4-5.) Roughly a year later, the parties agreed to another modified agreement. (Doc. 45 at ¶¶ 10-11; Doc 45-7 at 1-2, 6.) This agreement—which ended up being the last one between them—did not allow the Bowlers to draw additional amounts on the credit line. (*See* Doc. 45-7 at 4.) The original 2006 agreement, as altered by the 2010 and 2011 modified agreements, shall be referred to as the "Loan Agreement."

In 2018, the Bowlers stopped making their monthly payments under the Loan Agreement. (Doc. 45-8 at 4.) On June 21, 2019, a Notice of Trustee's Sale was recorded, which scheduled a trustee's sale of the Property on September 20, 2019. (Doc. 45 at ¶ 16; Doc. 45-8 at 1.) Wells Fargo advised the Bowlers to contact the company's Home Preservation Department "if they were having trouble paying their mortgage." (*See* Doc. 45 at ¶ 14.) They took Wells Fargo up on this invitation and on July 2, 2019, Michelle Gonzalez ("Gonzalez"), a Wells Fargo Home Preservation Specialist, faxed them a Mortgage Assistance Application. (Doc. 45 at ¶¶ 15-17.) The application included an income documentation guide that specified the documents needed to apply for a loan

---

[2] There are two sets of paragraphs numbered 1-4 in the Second Amended Complaint. In citing the factual allegations therein, the Court cites the paragraphs listed under the heading "Allegations Common to All Counts."

modification, such as pay stubs and tax returns. (*See* Doc. 45-9 at 10-13.) It also included various forms, including a financial worksheet and a hardship affidavit. (*See id.* at 15-25.)

The Bowlers filled out the application "with the supporting documents" and sent them to Wells Fargo "within two weeks." (Doc. 45 at ¶ 19.) On or about August 1, 2019, Gonzalez called Calvin and requested "further documentation . . . such as pay stubs and Social Security payment information," which the Bowlers sent to her three or four days later. (*See* Doc. 45 at ¶ 21.) On August 5, 2019, they also sent Wells Fargo a narrative letter it had requested. (Doc. 45 at ¶ 22.)

Gonzalez drafted a letter dated August 8, 2019 concerning "next steps" for the Bowlers, which included a table showing the status of the documents Wells Fargo needed from them "to complete the application." (Doc. 45 at ¶ 24; Doc. 45-11 at 1-3.) The table indicated some required documents had not been received, some documents had been received but were incomplete, and some documents had been received and were complete. (Doc. 45-11 at 1-3.) For example, the table noted the IRS Form 4506-T was missing numerous fields and that Calvin neglected to provide his two most recent and consecutive months of business bank statements. (*Id.* at 1-2.) Gonzalez's draft provided instructions regarding the absent and incomplete documents and set a deadline of September 7, 2019 for the Bowlers to submit them. (*Id.* at 1-3.) However, the Bowlers never received the letter. (Doc. 45 at ¶ 25.)

On August 14, 2019, Gonzalez called Calvin and asked for the "same documents." (*See* Doc. 45 at ¶ 27.) He told her "he had already sent all of the documents she requested days ago" and Gonzalez promised "she would look again to see whether she could find the documents." (*Id.* at ¶ 27.) But on September 3, 2019, she told Calvin she had not received the "additional documentation" and said she would look again for the documents. (*Id.* at ¶ 29.) Calvin subsequently faxed "the requested documents" to Wells Fargo. (Doc. 45 at ¶ 29.)

On September 13, 2019, Gonzalez drafted a letter to the Bowlers indicating Wells Fargo was no longer reviewing their account for assistance options, as Wells Fargo "didn't

receive all of the documentation" it needed. (Doc. 45-13 at 1.) The Bowlers never received this letter. (Doc. 45 at ¶ 35.) On September 18, 2019, Gonzalez told Calvin over the phone that his and Amy's application was "no longer in review." (*Id.* at ¶ 38.) On the day of the sale, the Bowlers "frantically" called Wells Fargo and were told there was nothing the company could do to stop the sale. (Doc. 45 at ¶¶ 41-42, 46.) The trustee sold the Property to BerryCo, LLC ("BerryCo").

Throughout the week following September 20, 2019, Calvin "became increasingly anxious and upset," and his blood pressure, which had previously been well-controlled, increased to the high 180s/120s. (Doc. 45 at ¶ 47.) On September 27, 2019, he visited his doctor, who increased his blood pressure medication. (Doc. 45 at ¶ 48.)

### B. Procedural History

On October 3, 2019, the Bowlers brought this action against Well Fargo and BerryCo. Along with their original complaint, which alleged eight causes of action, the Bowlers brought an emergency motion for an order to show cause, which was promptly denied as procedurally improper. A few days later, they filed a motion for a preliminary injunction or a temporary restraining order, which was denied that day without prejudice. After a scheduling conference concerning the motion, the Bowlers withdrew it and filed their first amended complaint, which dropped from the case both BerryCo and three causes of action. Wells Fargo moved to dismiss the action and the Bowlers responded by filing the Second Amended Complaint (Doc. 45), which alleges three causes of action: (1) negligence, (2) negligent infliction of emotional distress ("NIED"), and (3) various violations of the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.* ("RESPA").

### II. LEGAL STANDARD

A motion to dismiss tests the legal sufficiency of the plaintiff's pleading. Dismissal under Federal Rule of Civil Procedure 12(b)(6) can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). On the motion, all

allegations of material fact are taken to be true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, this principle does not apply to legal conclusions or conclusory factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Neither do "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

To state a claim for relief under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint need contain only "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff's pleading falls short of this standard, dismissal is appropriate.

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, "[t]he 'pleadings' include more than just the complaint." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018). The Court can consider, for example, exhibits attached to a complaint. *See id.* Indeed, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). That being said, the Court need not accept as true allegations that contradict exhibits. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

### III. ANALYSIS

#### A. The State Law Claims

Wells Fargo argues the Bowlers' negligence and NIED claims were waived under A.R.S. § 33-811(C) and fail on the merits. Because both claims are insufficient as a matter of law, the Court shall dismiss them with prejudice and without addressing the waiver argument.

##### 1. The Negligence Claim Fails Because Wells Fargo Did Not Owe the Bowlers a Duty of Care

The Bowlers' negligence claim fails because Wells Fargo did not owe them a duty. On a negligence claim, a plaintiff must show "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143 ¶ 9, 150 P.3d 228, 230 (2007) (en banc). Whether a duty exists is a "threshold issue" and "a matter of law for the court to decide." *Id.* at 143 ¶¶ 9, 11, 150 P.3d at 230.

"Courts in this District . . . have routinely held that lenders and loan servicers have a non-contractual duty towards borrowers which can give rise to negligence claims." *McMillan v. Wells Fargo Bank*, No. CV-12-01921-PHX-NVW, 2013 WL 11522057, at *6 (D. Ariz. Apr. 11, 2013) (collecting cases). However, that duty "is narrow, and generally limited to the duty to disclose to borrowers the correct amount of monthly payments due under their loan agreement." *Id.* (citing *McIntosh v. IndyMac Bank, FSB*, No. CV-11-1805-PHX-GMS, 2012 WL 176316 (D. Ariz. Jan. 23, 2012)); *see also Wells Fargo Credit Corp. v. Smith*, 166 Ariz. 489, 491-92, 494, 803 P.2d 900, 902-03, 905 (Ct. App. 1990) (finding there were material questions of fact concerning whether the defendant bank owed the plaintiffs borrowers a duty to disclose the correct monthly payment amount under their mortgage loan, and if so, whether such a duty was breached).[3]

---

[3] The Bowlers' invocation of California law as to the duty Wells Fargo purportedly owed them is unavailing. While a federal court must apply in a diversity case "the law of the state," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), it must follow the "law of the state *in which it sits*." *See Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821,

- 6 -

The Bowlers do not allege Wells Fargo failed to disclose the correct amount of their monthly payments under the Loan Agreement. Rather, they allege Wells Fargo failed to "timely and carefully process" their loan modification application. (*See* Doc. 45 at ¶ 57.) Therefore, this case does not fall into one of the categories of cases in which lenders and loan servicers owe a duty of care. *See Gipson*, 214 Ariz. at 143-44 ¶¶ 10-11, 150 P.3d at 230-31 ("[T]he issue of duty involves generalizations about categories of cases. . . . [A] conclusion that no duty exists is equivalent to a rule that, for certain categories of cases, defendants may not be held accountable for damages they carelessly cause, no matter how unreasonable their conduct.").

In their response, the Bowlers cite *Steinberger v. McVey ex rel. Cty. of Maricopa*, 234 Ariz. 125, 318 P.3d 419 (Ct. App. 2014), for the proposition that lenders have a duty of care "in dealing with loan modifications."[4] (*See* Doc. 49 at 6-7.) That case addressed a claim for negligent performance of an undertaking (also known as a claim under the Good Samaritan Doctrine)—a claim the Bowlers do not allege. *See Steinberger*, 234 Ariz. at 136-37 ¶¶ 44-46, 318 P.3d at 430-31.

But even if, liberally construing the Second Amended Complaint, *see Cousins*, 568 F.3d at 1067, they did, *Steinberger* is distinguishable. There, the court held:

> [A] lender may be held liable under the Good Samaritan Doctrine when: (1) a lender or its agent/representative, induces a borrower to default on his or her loan by promising a loan modification if he or she defaults; (2) the borrower, in reliance on the promise to modify the loan, subsequently defaults on the loan; (3) after the borrower defaults, the lender or its agent/representative negligently processes or fails to process the loan modification, or due to the lender/agent/representative's negligence, the borrower is not granted a loan modification; and (4) based on the default, the lender subsequently forecloses on the borrower's property.

*Steinberger*, 234 Ariz. at 138 ¶ 51, 318 P.3d at 432. This doctrine is limited. "We emphasize that our holding is limited to the particular allegations in this case." *Id.; see*

---

823 (9th Cir. 1974) (emphasis added). As this Court sits in Arizona, this Court must apply Arizona law.

[4] They also cite Nevada law, which has no bearing on this action. *See supra*, at footnote 3.

*also Garcia v. JPMorgan Chase Bank NA*, No. CV-15-01493-PHX-DLR, 2017 WL 1311668, at *9 (D. Ariz. Apr. 5, 2017) ("Arizona recognizes a cause of action for negligent performance of an undertaking—also referred to as the 'Good Samaritan Doctrine'—which may arise during the loan modification process under a narrow set of circumstances."). The Bowlers do not allege anyone at Wells Fargo ever promised them they would receive a loan modification. In fact, they do not even allege Wells Fargo promised it would stop the foreclosure sale. Further, by the time Wells Fargo sent them a loan modification application, they had already defaulted on the Loan Agreement. (Doc. 45 at ¶¶ 15-17; Doc. 45-8.) *Steinberger* simply does not fit the Bowlers' case.

For the foregoing reasons, the Bowlers' negligence claim fails to state a claim upon which relief can be granted and accordingly shall be dismissed with prejudice.

### 2. The NIED Claim Fails as a Matter of Law

The Bowlers allege they suffered "severe emotional distress" as a result of Wells Fargo's negligent handling of their loan modification application. (Doc. 45 at ¶ 67.) Specifically, they claim Calvin "suffered mental anguish manifested as high blood pressure" due to Wells Fargo's negligence and witnessing Amy's severe emotional distress. (*Id.* at ¶¶ 68-70.) They further allege he was in the "zone of danger so as to be subject to an unreasonable risk of bodily harm" created by Wells Fargo's negligence. (*Id.* at ¶ 71.) While the Second Amended Complaint does not expressly indicate that only Calvin is bringing this claim, there are no allegations concerning Amy.

Calvin's allegations try to invoke two conceptions of NIED that Arizona recognizes. The first conception (the "Bystander Conception") requires that a plaintiff "(1) witness an injury to a closely related person, (2) suffer mental anguish manifested as physical injury, and (3) be within the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." *See Pierce v. Casas Adobes Baptist Church*, 162 Ariz. 269, 272, 782 P.2d 1162, 1165 (1989). The second conception (the "Direct Conception") "arises when the distress results from an injury to the claimant themself." *Jones v. Bank of Am., N.A.*, No. CV-09-2129-PHX-JAT, 2010 WL 2572997, at *13 (D. Ariz. June 22,

2010) (citing *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 302-03, 995 P.2d 735, 738-39 (Ct. App. 1999)). It requires that (1) the defendant should have known that its conduct "involved an unreasonable risk of causing" distress and (2) from the facts it knew, the defendant "should have realized that the distress, if it were caused, might result in illness or bodily harm." *See id.* at 14 (quoting Restatement (Second) of Torts § 313 (1965)).

Each conception of the Bowlers' NIED claim fails as a matter of law. First, the Bystander Conception fails because the Bowlers have not plausibly alleged Calvin was in "the zone of danger so as to be subject to an unreasonable risk of bodily harm created by" Wells Fargo. *See Pierce*, 162 Ariz. at 272, 782 P.2d at 1165. While they allege he "was in the zone of danger so as to be subject to an unreasonable risk of bodily harm created by" Wells Fargo's "negligent handling of the loan modification," this allegation is nothing more than a "[t]hreadbare recital[]" of an element of their cause of action, and therefore "do[es] not suffice." *See Iqbal*, 556 U.S. at 678. Moreover, they cannot plausibly allege Calvin was in the zone of danger because the Bowlers have offered no authority that someone can be subjected to a risk of bodily harm, let alone an unreasonable one, by a loan servicer that advances foreclosure proceedings. *See Jones*, 2010 WL 2572997, at *1, *14 (finding, in a foreclosure case, that the plaintiff could not recover under the Bystander Conception because he was not in "the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant").

Second, the Direct Conception fails because the Bowlers have not even attempted to allege that Wells Fargo knew or should have known that Calvin (or Amy) was susceptible to an illness or bodily harm. Indeed, while they allege Calvin "suffered mental anguish manifested as high blood pressure" as a result of Wells Fargo's actions, (Doc. 45 at ¶ 68), they do not allege Wells Fargo knew or should have known that he was susceptible to high blood pressure. In addition, while the Bowlers plausibly alleged Wells Fargo caused Calvin's emotional distress, Wells Fargo's conduct did not "involve[] an unreasonable risk" in causing it. *See Jones*, 2010 WL 2572997, at *14 ("[T]his test requires an '*unreasonable* risk of causing distress.'" (quoting Restatement (Second) of Torts §

313)). Wells Fargo is not alleged to have scheduled the trustee's sale by mistake or told the Bowlers the sale would be cancelled. *See id.* (finding the defendant bank "scheduled the Trustee sale because Plaintiff was in default on Loan # 1. Therefore, even though the anticipated Trustee sale has likely caused Plaintiff distress, Defendant did not act unreasonably in pursuing the Trustee sale"). The Court is not aware of any case that found a loan servicer, in seeking to foreclose on a residence in default, engaged in conduct that involved an unreasonable risk of causing distress. *See id.*

For the foregoing reasons, the Bowlers' NIED claim is legally insufficient and accordingly shall be dismissed with prejudice.

### B.     The RESPA Claim

As the Bowlers have recognized, Wells Fargo's purported failure to comply with RESPA "is at the heart of this case." (*See* Doc. 8 at 1.) RESPA provides rules that loan servicers must follow in responding to loan modification requests, which are contained in Subpart C of the Consumer Financial Protection Bureau's ("CFPB") RESPA regulations collectively known as Regulation X. At issue here are the loss mitigation procedures contained in Subpart C and codified at 12 C.F.R. § 1024.41. The Bowlers allege violations of §§ 1024.41(b) and (c).

Wells Fargo argues these allegations fail for three independent reasons. First, it contends the Bowlers waived their RESPA claim under A.R.S. § 33-811(C). Second, it argues the Loan Agreement is not covered by Subpart C. Third, it asserts the allegations fail to state a claim. For the reasons stated below, the Court largely rejects these arguments.

#### 1.     A RESPA Claim Cannot Be Waived Under A.R.S. § 33-811(C)

Wells Fargo contends the Bowlers waived their RESPA claim by not obtaining an injunction before 5:00 p.m. on the day before the trustee's sale. A claim that raises an objection or defense to a trustee's sale is governed by A.R.S. § 33-811(C), which states:

> The trustor . . . shall waive all defenses and objections to the sale not raised in an action that results in the issuance of a court order granting relief pursuant to rule 65, Arizona rules of civil procedure, entered before 5:00 p.m. mountain standard time on the last business day before the scheduled date of the sale.

- 10 -

In other words, "a person who has defenses or objections to a properly noticed trustee's sale has one avenue for challenging the sale: filing for injunctive relief." *BT Capital, LLC v. TD Serv. Co. of Ariz.*, 229 Ariz. 299, 301 ¶ 10, 275 P.3d 598, 600 (2012).

The Arizona Supreme Court has broadly construed this statute. Indeed, the statute "prohibits not only actions to void the sale . . . but also those dependent upon the sale." *Zubia v. Shapiro*, 243 Ariz. 412, 415 ¶ 17, 408 P.3d 1248, 1251 (2018). Further, it "encompasses claims for damages which are based on a defective sale." *Id.* at 415 ¶ 18, 408 P.3d at 1251. However, "[a] trustor who fails to enjoin a sale . . . does not waive claims that are independent of the sale." *Id.* at 415 ¶ 20, 408 P.3d at 1251.

Taking the Arizona Supreme Court's cue, judges of this Court have often dismissed state law claims arising out of a trustee's sale on the basis of § 33-811(C). *See, e.g.*, *Hanks v. Harper*, No. CV-19-03174-PHX-DLR, 2019 WL 6715179, at *3 (D. Ariz. Dec. 10, 2019) (finding claims for slander of title, unjust enrichment, quiet title, and declaratory judgment were waived under § 33-811(C)); *Carmichael Real Estate, LLC v. First Citizens Bank & Trust Co.*, No. CV-13-00793-PHX-ROS, 2014 WL 12558246, at *1-2 (D. Ariz. May 20, 2014) (finding claims for fraud, negligent misrepresentation, negligence, and declaratory judgment were waived under § 33-811(C)). Never, however, has this Court or any Arizona court addressed at length the applicability of § 33-811(C) to federal claims.[5]

Even assuming, *arguendo*, the RESPA claim is dependent upon the trustee's sale and encompassed by § 33-811(C), it cannot be defeated by this statute under the Supremacy Clause of the United States Constitution. The Supremacy Clause provides:

---

[5] In 2017, a magistrate judge of this Court dismissed (along with numerous state law claims) a RESPA claim on § 33-811(C) grounds because it alleged "that the foreclosure should not have gone forward because Plaintiff submitted a loan modification application." *Hermosillo v. Caliber Home Loans Inc.*, No. CV-15-02052-PHX-ESW, 2017 WL 2653039, at *5 (D. Ariz. June 20, 2017). Two years later, a judge of this Court (without explanation) did not include a RESPA claim in the bundle of claims it dismissed under § 33-811(C). *Novotny v. Citibank, N.A.*, No. CV-19-0088-PHX-DGC, 2019 WL 3208113, at *3-4 (D. Ariz. July 16, 2019).

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. Accordingly, "[t]he elements of, and the defenses to, a federal cause of action are defined by federal law," *Howlett v. Rose*, 496 U.S. 356, 375 (1990), and "state law cannot provide a defense to federal claims." *Falcocchia v. Saxon Mortg., Inc.*, 709 F. Supp. 2d 860, 865 (E.D. Cal. 2010) (citing *Haywood v. Drown*, 556 U.S. 729, 763 (2009) (Thomas, J., dissenting)); *see also Deerpoint Grp., Inc., v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1233 (E.D. Cal. 2018) ("As applied to the DTSA [the federal Defend Trade Secrets Act], Defendants' arguments essentially amount to an attempt to impose a state law defense on a federal cause of action. Such an attempt is improper and unavailing.").

This principle has consistently been applied to prevent state laws from interfering with substantive federal rights. *See, e.g.*, *Bulletin Displays, LLC v. Regency Outdoor Advert., Inc.*, 448 F. Supp. 2d 1172, 1180-81 (C.D. Cal. 2006) (finding that applying California's anti-SLAPP statute to federal RICO and Clayton Act claims "arguably would permit state law to affect and alter the substance of federal claims in violation of the Supremacy Clause" and concluding that it "does not apply to federal question claims in federal court because such application would frustrate substantive federal rights"); *Williams v. Alhambra Sch. Dist. No. 68*, 234 F. Supp. 3d 971, 978-79 (D. Ariz. 2017) (determining an Arizona immunity statute could not immunize the defendants from the plaintiff's 42 U.S.C. § 1981 and § 1983 claims); *United States v. Hart*, District Case No. 2:11-CV-00513-EJL, 2012 WL 1662435, at *2-3 (D. Idaho Apr. 3, 2012) (striking an affirmative defense invoking the legislative immunity provision of the Idaho Constitution because "[f]ederal law controls the scope of any immunity raised as a defense in this federal cause of action [for failure to pay federal income taxes]").

It has even been applied with regard to a RESPA claim. In *Falcocchia*, a case that involved the foreclosure of the plaintiffs' mortgage, the defendants argued the plaintiffs'

claims, including a RESPA claim, were barred by a California doctrine that "requires a valid tender of payment to bring any claim that arises from a foreclosure sale." *Falcocchia*, 709 F. Supp. 2d at 863, 865. The plaintiffs had not alleged they were able to tender the loan proceeds. *See id.* at 865. The court rejected this argument in part because "state law cannot provide a defense to federal claims" and noted the lack of authority "discussing a federal tender requirement, or tender as a prerequisite for plaintiffs' . . . RESPA [claim]." *Id.* (citing *Haywood*, 556 U.S. at 763 (Thomas, J., dissenting)).

Also instructive is the Supreme Court's decision in *Haywood v. Drown*, 556 U.S. 729 (2009). There, the Court considered the constitutionality of a New York statute that stripped New York trial courts of jurisdiction over § 1983 suits that seek money damages from correction officers. *Id.* at 731. The Court held the statute unconstitutional as applied to § 1983 actions on Supremacy Clause grounds, explaining that states "lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies" and that New York's policy was "contrary to Congress' judgment that all persons who violate federal rights while acting under color of state law shall be held liable for damages." *Id.* at 734, 736-37. While the discussion chiefly concerns the relationship between federal claims and state courts, the interest in preserving federal substantive rights against state law incursions is only greater here in this federal forum.

A.R.S. § 33-811(C), as applied to the Bowlers' RESPA claim, is exactly the type of state law defense that was rejected in the foregoing cases, as it "would permit state law to affect and alter the substance" of RESPA by imposing a pre-suit injunction requirement that is nowhere in the statute itself or the CFPB's regulations. *See Bulletin Displays, LLC*, 448 F. Supp. 2d at 1181; *see also Falcocchia*, 709 F. Supp. 2d at 865 ("Defendants do not argue or cite to any authority discussing a federal tender requirement, or tender as a prerequisite for plaintiffs'. . . RESPA [claim]."). Indeed, while the Bowlers cannot obtain an injunction pursuant to RESPA, *see Pacifico v. Nationstar Mortg., LLC*, Civil Action No. 15-11841, 2017 WL 1213662, at *3 (E.D. Mich. Feb. 10, 2017) (finding "RESPA permits as relief only actual damages and statutory damages"), they may obtain damages

thereunder. Moreover, allowing § 33-811(C) to bar RESPA damage claims would run afoul of the Ninth Circuit's guidance that "RESPA's provisions relating to loan servicing procedures should be construed liberally to serve the statute's remedial purpose." *See Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2002) (discussing Congress' purpose in enacting RESPA).

Arizona has no interest in dictating the contours of RESPA, no matter how expansively A.R.S. § 33-811(C) is construed. Therefore, that statute cannot govern here, and the Bowlers did not waive their RESPA claim by failing to seek and get a preliminary injunction against the trustee's sale.

### 2. The Loan Agreement Is Covered by Subpart C

Wells Fargo next argues the Loan Agreement is not covered by Subpart C of Regulation X. Specifically, they contend the Loan Agreement is exempt from the requirements of Subpart C because it is an open-end line of credit and such lines of credit are carved out from Subpart C in its definitions section. *See* 12 C.F.R. § 1024.31 ("Mortgage loan means any federally related mortgage loan, as that term is defined in § 1024.2 subject to the exemptions in § 1024.5(b), but does not include open-end lines of credit (home equity plans).").

The Loan Agreement, as alleged and as foreclosed on, was not an open-end line of credit. Because of the two modifications the parties made to their original 2006 agreement, the Bowlers became unable to draw additional amounts on their credit line. (Doc. 45-6 at 1, 4-5; Doc. 45-7 at 4.) While the Loan Agreement, as originally constructed, was an open-end line of credit that the Bowlers could (and did) draw from, by the time the Bowlers applied for a loan modification, it was a closed one.

Though it does not govern here, this conclusion tracks the CFPB's Regulation Z regarding the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). Regulation Z defines "open-end credit" in part as "consumer credit extended by a creditor under a plan in which . . . [t]he creditor reasonably contemplates repeated transactions." *See* 12 C.F.R. § 226.2(20). Once the agreement was modified to end additional extensions of credit,

Wells Fargo could not reasonably contemplate repeated transactions. The Loan Agreement is therefore covered by Subpart C.

### 3. The Bowlers Sufficiently Alleged a Violation of 12 C.F.R. § 1024.41(b), but Not of § 1024.41(c)

The Bowlers allege Wells Fargo violated 12 C.F.R. §§ 1024.41(b)(2), (c)(1), and (c)(3)(i).

#### a. § 1024.41(b)

Under 12 C.F.R. § 1024.41(b)(2), "[i]f a servicer receives a loss mitigation application 45 days or more before a foreclosure sale," a servicer is required to, "[p]romptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete." *Id.* at § 1024.41(b)(2)(i)(A). More importantly, it is also required to "[n]otify the borrower in writing within 5 days . . . after receiving the loss mitigation application" (1) "that the servicer acknowledges receipt of the loss mitigation application," and (2) "that the servicer has determined that the loss mitigation application is either complete or incomplete." *Id.* at § 1024.41(b)(2)(i)(B). "If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date . . . . by which the borrower should submit the documents and information necessary to make the loss mitigation application complete." *Id.* at § 1024.41(b)(2)(i)(B); § 1024.41(b)(2)(ii).

The Bowlers sufficiently allege Wells Fargo failed to notify them in writing that it received their application and determine whether it was complete or incomplete. Wells Fargo does not fall into the trap of arguing that Gonzalez's telephonic document requests constitute the notice required by the regulation, *see Yeh Ho v. Wells Fargo Bank, N.A.*, 739 F. App'x 525, 529 (11th Cir. June 21, 2018) ("Ho submitted an application to Wells Fargo, but did not receive a *written* response as required by § 1024.41(b)(2)(B) . . . . Ho's complaint therefore alleges sufficient facts to state a plausible violation of RESPA and Regulation X" (emphasis added)), or that the regulation requires the Bowlers to have

submitted a complete loss mitigation application. *See Hackett v. Wells Fargo Bank, N.A.*, Case No. 2:17-CV-07354-CAS-ASx, 2019 WL 5784741, at *9 (C.D. Cal. Nov. 4, 2019) (explaining that 12 C.F.R. § 1024.41(b) "on its face, plainly applies to incomplete applications"). Rather, Wells Fargo argues it did, in fact, provide the Bowlers with the required written notice and cites the August 8, 2019 letter Gonzalez drafted. (*See* Doc. 45-11 at 1-3.) This letter is alleged in the Second Amended Complaint and its contents satisfy § 1024.41(b)(2). However, the Bowlers allege they never received it. (Doc. 45 at ¶ 25.) Moreover, nothing on the face of the letter or in any of the other exhibits indicates the letter was even sent or received. Accordingly, the Bowlers adequately allege Wells Fargo never provided them with the written notice required under 12 C.F.R. § 1024.41(b)(2).

### b. § 1024.41(c)

The Second Amended Complaint alleges Wells Fargo did not satisfy any of the requirements in 12 C.F.R. §§ 1024.41(c)(1) and (c)(3)(i). However, as Wells Fargo points out, these requirements could only have been triggered if the Bowlers submitted a complete loss mitigation application. A "loss mitigation application" is "an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option." 12 C.F.R. § 1024.31. A "complete loss mitigation application" is "an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." *Id.* at § 1024.41(b)(1). The issue is whether the Bowlers allege they submitted everything Wells Fargo required from them.

They did not so allege, as it is not clear what they submitted. Indeed, while the Bowlers claim they sent to Wells Fargo all of the documents Gonzalez requested, they hardly identify them. They allege they "completed" their application "with the supporting documents" and sent them to Wells Fargo in July 2019, (*see* Doc. 45 at ¶¶ 18-19); they sent the "new" documents requested by Gonzalez to Wells Fargo in August, (*id.* at ¶ 21);[6]

---

[6] While the Bowlers specify Gonzalez asked for pay stubs and social security payment information, they nevertheless imply that she asked for other, unidentified documents. (*See* Doc. 45 at ¶ 21 (alleging "Ms. Gonzalez . . . requested further documentation regarding the Plaintiffs' income, *such as*" pay stubs and social security information (emphasis added)).)

- 16 -

and Calvin told Gonzalez on August 14, 2019 that "he had already sent all of the documents she requested days ago." (*Id.* at ¶ 27.) But these vague assertions of what they submitted, devoid of "further factual enhancement," *see Twombly*, 550 U.S. at 557, are nothing more than conclusory factual allegations.[7] *See Iqbal*, 556 U.S. at 678. Moreover, they are undercut by the fact the Bowlers do not reference their application's income documentation guide, which listed the documents Wells Fargo needed. (*See* Doc. 45-9 at 10-13.) While Rule 8 "does not require detailed factual allegations," it demands more than the unadorned allegations in the Second Amended Complaint. *See Iqbal*, 556 U.S. at 678.

But contrary to Wells Fargo's argument, the Bowlers did not plead themselves out of their § 1024.41(c) claim via their exhibits. Wells Fargo contends the Bowlers did not submit a complete loss mitigation application primarily based on exhibits attached to Calvin's declaration.[8] However, those exhibits are of no import here, as Calvin's declaration (Doc. 45-10), as well as Amy's (Doc. 45-3), cannot be considered at this early litigation stage.

While the Court can consider exhibits attached to the Second Amended Complaint, *see Hicks*, 897 F.3d at 1117, and a "copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes" under Rule 10(c), the declarations are not written instruments. While neither Rule 10(c) nor the Ninth Circuit has defined the term "written instrument," *Ross v. Williams*, 950 F.3d 1160, 1168-69 (9th Cir. 2020) (en banc), the types of instruments that typically qualify for incorporation under Rule 10(c) "'consist largely of documentary evidence, specifically, contracts, notes, and other writings on which a party's action or defense is based.'" *See DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1220 (S.D. Cal. 2001) (quoting *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3d

---

[7] This is not to say that none of them are properly pleaded. For example, the Bowlers note they sent a narrative letter to Wells Fargo. (Doc. 45 at ¶ 22.)

[8] It also argues—based on the August 8 and September 13, 2019 letters and allegations that Gonzalez told the Bowlers Wells Fargo had not received all of the documents it required—that the Bowlers did not submit a complete loss mitigation application because they "were repeatedly advised by Wells Fargo that their application was incomplete." (Doc. 48 at 10.) The letters are of no consequence because they were not sent or at least not received. (Doc. 45 at ¶¶ 25, 35.)

Cir. 1989)); *see also Trombley Enters., LLC v. Sauer, Inc.*, Case No. 5:17-cv-04568-EJD, 2018 WL 4407860, at *2 (N.D. Cal. Sept. 17, 2018) ("Common exhibits to complaints include agency decisions, contracts, patents, correspondence, and the like."). In contrast, "witness affidavits and other exhibits containing largely evidentiary material," as well as other documents "created for purposes of litigation," are typically not considered to be written instruments. *See Montgomery v. Buege*, No. CIV. 08-385 WBS KJM, 2009 WL 1034518, at *3 (E.D. Cal. Apr. 16, 2009); *Trombley Enters.*, 2018 WL 4407860, at *2; *see also Sell v. Zions First Nation Bank*, No. CV 05 0684 PHX SRB, 2006 WL 322469, at *5 (D. Ariz. Feb. 9, 2006) (finding a report "prepared by Plaintiff (or his lawyer)" that "set forth Plaintiff's view of how he believes" the events detailed in his complaint transpired was "simply an expanded version" of his complaint and did not "meet the definition of a 'written instrument'"). "Affidavits and declarations . . . are not allowed as pleading exhibits unless they form the basis of the complaint." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015) (holding a plaintiff's affidavit is not a written instrument for purposes of Rule 10(c)).

The two declarations attached to the Second Amended Complaint are neither written instruments nor incorporated by reference (assuming that doctrine is relevant here) because they do not "form the basis of" the Bowlers' RESPA claim. *See Ritchie*, 342 F.3d at 908. They appear to be nothing more than documents created specifically for this litigation. *See Trombley Enters.*, 2018 WL 4407860, at *2. Accordingly, the declarations, including the exhibits thereto, shall not be considered.

In summary, the Bowlers' allegations on this RESPA count are insufficient to allege that they supplied Wells Fargo with all the documents they requested. But if the Bowlers did supply all the requested documents, despite the extreme unartfulness of their pleading, and they can so allege, then they should. The Court could order the Bowlers to file a more definite statement under Rule 12(e). *See Kirkpatrick v. County of Washoe*, 792 F.3d 1184, 1191 (9th Cir. 2015), *on reh'g en banc*, 843 F.3d 784 (9th Cir. 2016). But it is simpler to grant the motion to dismiss as to 12 C.F.R. § 1024.41(c) with leave to amend to plead

further. If the Bowlers fail to further plead, that will mean they cannot say straight out that they supplied Wells Fargo with all the requested documents.

IT IS THEREFORE ORDERED that Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 48) is granted in part and denied in part.

IT IS FURTHER ORDERED that Plaintiffs' negligence claim is dismissed, with prejudice.

IT IS FURTHER ORDERED that Plaintiffs' negligent infliction of emotional distress claim is dismissed, with prejudice.

IT IS FURTHER ORDERED that Defendant's motion to dismiss Plaintiffs' RESPA claim under 12 C.F.R. § 1024.41(b) is denied.

IT IS FURTHER ORDERED that Plaintiffs' RESPA claim under 12 C.F.R. § 1024.41(c) is dismissed for failure to state a claim, with leave to amend by August 7, 2020, failing which that claim will be dismissed with prejudice.

Dated this 24th day of July, 2020.

_____
Neil V. Wake
Senior United States District Judge